UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
UNITED STATES OF AMERICA      :

      -against-             :        **(S2) 11-CR-878 (LAK)**

VALERI ALEKSEJEV,      :

            Defendant.     :
-------------------------------------------------------x


## MEMORANDUM IN AID OF SENTENCING
## ON BEHALF OF DEFENDANT VALERI ALEKSEJEV

WILLIAM STAMPUR, ESQ.
Hurwitz Stampur and Roth
**VALERI ALEKSEJEV**
299 Broadway, Suite 800
New York, NY 10007
(212) 619-4240

INTRODUCTION

I respectfully submit this memorandum in aid of sentencing on behalf of the defendant, Valeri Aleksejev, who is scheduled to be sentenced on July 30, 2013. By his guilty plea, Mr. Aleksejev accepted responsibility and stipulated to the government's guidelines calculations contained in its plea agreement. Neither in this memorandum nor at the sentencing proceeding will Mr. Aleksejev seek to relitigate the guideline issues and calculations resolved therein. However, Mr. Aleksejev does not agree that the resulting guidelines calculation which is driven almost exclusively[1] by the amount of the loss and the number of victims produces a reasonable or appropriate guideline range in this case.

This guideline range of 97 to 121 months well exceeds what is sufficient to address the purposes of sentencing enumerated in 18 United States Code (U.S.C.) 3553(a). In that respect, it runs afoul of Section 3553(a)'s parsimony clause, which directs the Court to fashion a sentence no greater than necessary to meet the statutory sentencing purposes. When the idiosyncrasies of the Guidelines are applied to this case and to Mr. Aleksejev's conduct in particular, their shortcomings quickly reveal themselves. A Guidelines sentence, driven as it is so heavily by the fraud loss and number of victims, would not reflect the nature and circumstances of the offense, Mr. Aleksejev's role in it and his history and characteristics. Mr. Aleksejev respectfully submits that due consideration of the 3553(a) factors including but not limited to the Guidelines, compels a substantial variance from the advisory Guideline range.

---

[1] The enhancements for fraud loss and the number of victims constitute 80% of his adjusted offense level under the guidelines. *See United States v. Grier*, 475 F.3d 556, 566 (3d Cir. 2006) (sentencing enhancements become the tail which wags the dog of the substantive offense).

1

## THE INSTANT OFFENSE

Mr. Alekesejv pleaded guilty to two counts of a superseding indictment, charging conspiracy to commit wire fraud under 18 U.S.C. § 1343, 1349, and conspiracy to commit computer intrusion under 18 U.S.C. 1030. The wire fraud count carries a twenty-year maximum, whereas the computer count carries a five-year maximum.

The Plea Agreement assumes the following guideline calculations:

The Applicable Guidelines Range

| | |
|---|---|
| Base Offense Level: | 7 |
| Loss Amount Between $2.5 and $7 Million 2B1.1(b)(1)(k) | 18 |
| Victim-related adjustment (250+) §2B1.1(b)(2)(C) | 6 |
| Sophisticated Means §2B1.1(b)(10) | 2 |
| Acceptance of Responsibility | -3 |
| Adjusted Offense Level | 30 |

## DEFENDANT'S CRIMINAL HISTORY

Mr. Aleksejev, prior to this arrest, had never been charged with any criminal conduct anywhere. Therefore, he has 0 criminal history points and a Criminal History category of 1 (see PSR ¶64).

## OBJECTIONS TO PSR

Mr. Aleksejev respectfully objects to:

Paragraph 18: He objects to the language "tens of millions of system infections", "hundreds of millions of dollars worth of damage" and "advanced viruses" (compare with paragraph 26 as alleged in the indictment).

Paragraph 22: Mr. Aleksejev worked on web development and did receive emails, but not "whenever" the company encountered problems.

Paragraph 33: Mr. Aleksejev had no operation and control over any aspect of Rove Digital or any other related company involved in the fraud.

Paragraph 68: strike the word "current" and Mr. Aleksejev did not live there until his November 2011 arrest.

## OFFENSE CONDUCT

Mr. Aleksejev was charged in this federal indictment with six co-defendants before Your Honor alleging wire fraud and computer intrusion.  Mr. Aleksejev is named in five of the 27 counts in the indictment.

In 2011, all named co-defendants and Mr. Aleksejev, with the exception of Andrey Taame were arrested in Estonia.  Mr. Aleksejev, along with co-defendant Ivanov were two co-defendants extradited from Estonia, while the other co-defendants remain in Estonia presently on trial for money-laundering and other related offenses.

As Mr. Aleksejev was not involved in any of the financial dealings in the alleged fraud(s), joined Rove Digital in 2007 (later than all other named co-defendants), and was a salaried employee, he was not charged in Estonia.  The government has indicated when the

3

criminal proceedings against the co-defendants in Estonia are completed, they will proceed with their extradition to this Court.

Mr. Aleksejev acknowledges through his plea of guilty and letter to the court (See Valeri Aleksejev letter dated 7/11/2013 attached as Exhibit A), his wrongdoing and responsibility for his offense conduct in the course of his employment as a programmer at Rove Digital and Infradata.

His illicit actions were taken at the direction of his co-conspirators. Mr. Aleksejev did not initiate any plan or direct others in connection with the fraud. Notwithstanding that he was a salaried employee, he now recognizes his role aided the success of the scheme, and for this he is truly repentant.

GUIDELINES

### A.   The Guidelines Place in Sentencing

The sentencing court may not presume that the advisory Guidelines range is reasonable. *See Gall v. United States*, 552 U.S. at 50 (2007); *United States v. Broxmeyer*, 699 F.3d 265, 290 (2d Cir. 2012) (the district court "cannot assume that a Guidelines sentence is warranted in a particular case but, rather, must make an independent sentencing determination."). Its individualized determination as to an appropriate sentence is informed by the 3553(a) factors and the facts presented, not the Guidelines. *See United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (the court must form its own view of the "nature and circumstances of the offense and the history and characteristics of the defendant."). Accordingly, the Guidelines are only the "starting point and the initial benchmark." *Gall*, 552 U.S. at 49. We do not start out with a "thumb on the [Guidelines] scale," *Kimbrough*, 552 U.S. 85, 113 (2007) (Scalia, J., concurring), especially at the expense of other statutory sentencing factors. They are not accorded greater weight than the

other statutory sentencing factors. *See Gall*, 552 U.S. at 59 ("the Guidelines are only one of factors to consider when imposing sentence"); *Federal Criminal Practice: A Second Circuit Handbook*, Gordon Mehler, John Gleeson, & David C. James, at § 42-2(d) (11th ed. 2011).

In this sense, the Guidelines are "*truly* advisory." *Rita*, 551 U.S. at 367 (Stevens, J., concurring); *Cavera*, 550 F.3d at 189 (making it "emphatically clear that the Guidelines are guidelines -- that is, they are truly advisory"). *Kimbrough* makes clear that *all* Guidelines are advisory only, and that courts may vary from them on the basis of categorical policy disagreements. 552 U.S. 85 (2007); *see also Spears v. United States*, 555 U.S. 261, 263-67 (2009); *Cavera*, 550 F.3d at 191-96. Guidelines that do not take into account empirical data and national experience "do not exemplify the [Sentencing] Commission's exercise of its characteristic institutional role."[2] *Kimbrough*, 552 U.S. at 109. The court's latitude to disagree with the Guidelines is greatest for those that lack a basis in empirical data and national experience. *See, e.g., Kimbrough*, 552 U.S. at 109-110 (crack-cocaine ratios); *United States v. Dorvee*, 604 F.3d 84 (2d Cir. 2010) (child pornography).

## B.   Genesis and Development of the Economic Loss Guideline

The labyrinthine Guideline covering economic loss (Chapter 2B1.1) is another such example, and this was true right from the start. "For policy reasons, the Commission did not employ its characteristic empirical approach when setting the Guidelines ranges for white-collar

---

[2] The Commission's characteristic institutional role encompasses review of empirical evidence and consultation with participants and experts in sentencing. *See Rita*, 551 U.S. at 348-50. Its expertise was supposed to derive from sober-minded analysis and policy discussion. *See Mistretta v. United States*, 488 U.S. 361, 379 (1989) ("Developing proportionate penalties for hundreds of different crimes by a virtually limitless array of offenders is precisely the sort of intricate, labor-intensive task for which delegation to an expert body is especially appropriate"); *United States v. Spencer*, 700 F.3d 317, 328 (8th Cir. 2012) (Bright, J., dissenting) ("The creation of an independent, bipartisan commission was designed to insulate sentencing policy, to some extent, from the political passions of the day: research and reason, not politics, were to govern the guidelines.") (quoting authority).

crimes." *United States v. Herink*, 2012 U.S. Dist. LEXIS 105449, at *12 (D. Neb. July 30, 2012)
(citing authority).  Because the Commission, in looking at empirical data, had determined that
many fraud sentences were disproportionately low, it adopted a paradigm of short but definite
terms of imprisonment, as opposed to the frequent pre-Guidelines practice of sentencing first
time, non-violent white-collar offenders to probation.  It also placed the pecuniary loss from the
offense as the primary determinant of length of sentence.  *See Fifteen Years of Guidelines
Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the
Goals of Sentencing Reform* (U.S.S.C. November 2004).

Since the original guidelines were promulgated in 1987, fraud sentences have grown
increasingly punitive and *disproportionate* through increases in the amount of specific offense
characteristics (6 to 18), and number of points for the amount of the loss.  The Commission has
all but abandoned its original guidepost for white-collar sentencing, that short but definite
periods of imprisonment achieve an adequate deterrent effect, provide just punishment, and are
proportional to sentences for other offenses.  Worse yet, these increases have been
unaccompanied by empirical and experiential support that might demonstrate why longer
sentences were needed, or why shorter terms were insufficient to achieve the goals of sentencing.
*See* Alan Ellis, John R. Steer & Mark H. Allenbaugh, *At a "Loss" for Justice: Federal Sentencing
for Economic Offenses*, 25 Crim. Just. 34  (2011) ("[A]s legislatively directed enhancements
have proliferated, particularly within the fraud guideline, the objective of proportionality among
offenses has gone by the wayside."); *United States v. Adelson*, 441 F. Supp. 2d , 514 (S.D.N.Y.
2006) (comparing the lack of empirical support that the Guideline regime achieves the objectives
served by sentencing, with "considerable evidence that even relatively short sentences can have a
strong deterrent effect on prospective white-collar offenders").

Therefore, under *Kimbrough*, district judges have more discretion to disagree with the draconian sentences that the fraud Guidelines conjure up. *See Herink*, 2012 U.S. Dist. LEXIS 105449, at *19 ("Because the fraud offense Guidelines were promulgated pursuant to Congressional directive rather than by application of the Sentencing Commission's unique area of expertise, the court affords them less deference than it would to empirically-grounded Guidelines.").

The wave of corporate accounting scandals at the beginning of this century in some ways matched the Crack-cocaine epidemic of the 1980s, in that the Commission, as an initial response, formulated harsh guidelines untethered to empirical, scientific research, which over time lost the respect of a good part of the judiciary.[3] *See* Alexandra M. Walsh, Andrew George, & Julie Rubenstein, *Re-Examining the Sentencing Guidelines for Federal Securities Fraud Cases*, 89 Crim. L. Reporter 833 (Sept. 21, 2011) ("*Adelson* [substantial downward variance occasioned by a high fraud loss] also presaged *Kimbrough* in that it involved a judge's refusal to follow a guideline born not of the commission's institutional expertise and national experience but of political forces emanating largely from Congress."). But while Congress and the Commission have begun to rectify the Crack-cocaine issue, policy makers have not yet signaled any retreat with respect to fraud loss.

Accordingly, it has been judges themselves, more insulated from political pressures, who have taken up the charge of crafting fair sentences for fraud offenders by varying (in some cases to a great extent) from the guidelines range. "[S]ince *Booker*, virtually every judge faced with a top-level corporate fraud defendant in a very large fraud has concluded that sentences called for

---

[3] The Department of Justice has acknowledged that high fraud loss calculations under the guidelines have "lost the respect of a large number of judges". *Letter to Hon. William K. Sessions from Jonathan J. Wroblewski*, June 28, 2010, at 2.

the Guidelines were too high.  This near unanimity suggests that the judiciary sees a consistent disjunction between the sentences prescribed by the Guidelines and the fundamental requirement of Section 3553(a) that judges impose sentences sufficient, but not greater than necessary to comply with its objectives."  Frank Bowman, *Sentencing High-Loss Corporate Insider Frauds After* Booker, 20 Fed. Sent. Rep. 167, 169 (Feb. 2008).

### C.   <u>Loss Amount and Culpability</u>

Like the drug guideline's inordinate emphasis on weight, judicial dissatisfaction with the fraud guidelines stems largely from the distortive effects created by linking the length of sentence to the amount of the loss without regard to culpability.  *See Spencer*, 700 F.3d at 327 (Bright, J. dissenting); *Adelson*, 441 F. Supp. 2d at 509 ("What drove the Government's calculation in this case, more than any other single factor, was the inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of [loss]."); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (criticizing the guidelines for placing "excessive weight on [the fraud loss] factor, attempting no doubt in an effort to fit the infinite variations on the theme of greed into a limited set of narrow sentencing boxes to assign precise weights to the theft of different dollar amounts"); James E. Felman, *Change in Federal Criminal Justice: Views from the Defense and Policy Advocacy Communities: The Need to Reform the Federal Sentencing Guidelines for High-Loss Economic Crimes*, 23 Fed. Sent. Rep. 138 (Dec. 2010) ("The reliance on loss to drive sentencing outcomes is simply out of control and complaining of the multiple upward adjustments that, either singly or in combination, produce a piling-on effect beyond their underlying rationale and often smack of double counting").

The dubious genesis of the fraud guideline grounded in how the prevailing political winds were blowing rather than in empirical and experiential reality, plagues it in two related ways. First, the numbers themselves are wholly arbitrary. *See United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012) (finding that the numbers assigned by the Sentencing Commission to various factors are "plucked from thin air [and] appear to be more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology"); *Adelson*, 441 F. Supp. 2d at 509 (criticizing the emphasis on measurable quantities like fraud loss "without, however, explaining why it is appropriate to accord such huge weight to such factors"); *Testimony of Jon Newman Before the United States Sentencing Commission*, July 9, 2009, at 7-8 (arguing that the incremental increase in punishment by loss amount as "creates an illusion of precision . . . [and] makes no penological sense").

Second, there is frequently little correlation between the amount of the loss and the defendants' relative levels of culpability. *See Emmenegger*, 329 F. Supp. 2d at 427-28 (noting that loss amount is frequently a relatively weak indicator of the moral seriousness of the offense or the need for deterrence); *Herink*, 2012 U.S. Dist. LEXIS, at *19 (loss "is not always a reliable proxy for the culpability of an individual defendant. When losses amount to millions of dollars, the Guidelines' graduated system of increasing culpability aligned with increasing loss is especially skewed."). Loss amount, though not irrelevant, does not take into account the 3553(a) factors and therefore ends up often overstating the seriousness of the offense. *See United States v. Prosperi*, 686 F.3d 32, 43-44 (1st Cir. 2012); *Spencer*, 700 F.3d at 325 (Bright, J., dissenting) ("The fraud guidelines . . . no longer provide a reasonable starting point for sentencing [because] [a]djustments based on the amount of the loss lead to astronomical sentences that have little connection to criminality."). Linking the loss amount to the length of the sentence "often results

9

in widely unwarranted sentencing disparity and a lack of certainty in sentencing, and produces sentences grossly disproportional to the actual seriousness of the offense." Ellis *et. al.*, *supra*.

The Second Circuit has been skeptical of some Guidelines enhancements that "apply without modulation to a wide range of conduct." *Cavera*, 550 F.3d at 192. *Cavera* highlighted 2B1.1 as an example which drastically var[ies] as to the recommended sentence based simply on the amount of money involved. *Id.* Grouping together defendants with a broad spectrum of culpability may call for the district court to impose non-Guideline sentences based on the 3553(a) factors. *Id.*; *see also United States v. Stewart*, 590 F.3d 93, 136, 144 (2d Cir. 2009) (the "district court may find that . . . there is a wide variety of culpability amongst defendants [under the same guideline] and, as a result, impose different sentences based on the factors identified in 3553(a).") (citing *Cavera*); *United States v. Adelson*, 301 Fed. Appx. 93, 94 (2d Cir. 2008) (applying *Cavera*'s language on the fraud Guideline's suspect application to a wide spectrum of culpability); Ellis *et. al.*, *supra* (describing the fraud guideline as a "series of ad hoc amendments covering a vast array of distinctly dissimilar conduct").

### D.    **What Courts Have Done**

Faced with the prospect of sentencing high fraud loss offenders to draconian Guideline sentences, a number of judges in this district and elsewhere have recognized that such high sentences do not fairly reflect the culpability of the defendant before them, and have accordingly imposed substantial downward variances under Section 3553(a), sometimes with blistering criticism. *See Adelson*, 301 Fed. Appx. at 94-95 (affirming 42 month sentence as a carefully considered reliance on the Section 3553(a) factors where offense level was 55, and loss amount of $50 million); *United States v. Parris*, 573 F. Supp. 2d 744, 750-54 (E.D.N.Y. 2008) (varying downward in pump and dump fraud case to 60 months from "draconian and unrealistic"

guideline range of 30 years, which should not be a "black stain on common sense"); *United States v. Treacy*, No. 08-CR-366 (S.D.N.Y.) (24 month sentence, down from guidelines range of 24-37 years); *Gupta*, 904 F. Supp. 2d at 355 (granting variance to insider trader from advisory guideline range of 97 to 121 months on basis of $15 million gain, to two years imprisonment); *United States v. Ovid*, 2010 U.S. Dist. LEXIS 105390, at *9 (E.D.N.Y. Oct. 1, 2010) (sentencing defendant to five year term where guideline range was 210-262 months); *United States v. Watt*, 707 F. Supp. 2d 149, 151, 154 (D. Mass. 2010) (24 months[4] for offense level 43 and $20 billion fraud loss; guidelines "of no help" and "almost irrelevant"); *Adelson*, 441 F. Supp. 2d at 515 (dismissing guidelines recommendation as patently unreasonable, patently absurd, barbar[ous], wildly off base, and denouncing the "utter travesty of justice that sometimes results from the guidelines fetish with abstract arithmetic, as the harm that guidelines calculations can visit on human beings if not cabined by common sense").

Of course, these defendants each brought different facts and considerations to the table and may not all have been similarly situated to one another and certainly not to Mr. Aleksejev. But that is the point: "the fraud guideline, despite its excessive complexity, still does not account for many of the myriad factors that are properly considered in fashioning just sentences, and indeed no workable guideline could ever do so." *Ovid*, 2010 U.S. Dist. LEXIS 105390, at *4.

<u>THE APPROPRIATE SENTENCE UNDER 18 U.S.C. § 3553(a)
APPLICATION TO MR. ALEKSEJEV AND HIS CONDUCT</u>

Scrupulous consideration of the 3553(a) factors, notably the nature and circumstances of the offense and Mr. Aleksejev's history and characteristics, compels the conclusion that the

---

[4] In both *Watt* and *Ovid*, the defendants pleaded guilty to conspiracy counts with a statutory maximum of five years imprisonment, but the cases call attention to how much power and responsibility prosecutors hold in their charging discretion.

11

advisory Guideline range, reliant as it is so heavily on the distorting effect of the loss, does not reflect the reality of his conduct and his role, overstates the seriousness of the offense, and therefore yields a sentencing range greater than necessary. *See Adelson*, 441 F. Supp. 2d at 515 ("[W]here, as here, the calculations under the guidelines have run amok, a Court is forced to place greater reliance on the [other 3553(a) factors]").

The Guidelines mechanistic approach, focusing almost exclusively on a high loss figure, virtually ignores the fact that Mr. Aleksejev was an employee with little discretionary authority, received only a modest salaried compensation, did not otherwise benefit or profit from the high loss figure or the fraud generally [unlike "typical white-collar defendants, " *Prosperi*, 686 F.3d at 44], and did not realize the full extent of the scheme or the economic damage that it could engender. While these facts do not absolve him of liability, they position him favorably along the fraud guidelines wide spectrum of culpability. *See, e.g., United States v. Marsh*, 820 F. Supp. 2d 320, 334 (E.D.N.Y. 2012) (distinguishing among fraud co-defendants, for purposes of culpability, based on whether they were architects of the scheme or employees brought in to execute it, the length of employment, and amount of money they made). Other than sharing an offense of conviction and being subject to the same guideline, he has little in common with the offenders that the fraud Guidelines were meant to target. A guideline sentence is at odds with the individualized assessment that *Gall*, 552 U.S. at 50 requires.

Mr. Aleksejev is a web developer whose skills were exploited by others in order to advance the charged conduct. He writes:

> At some time I came across the DNS Project and even did some tasks for the project. I didn't realise how dangerous this project was for me and for my future. It was not obvious to me that working on this project could be considered as doing a crime on another side of the world. I didn't recognize the seriousness of the flaws in the project. I am a technician, I

12

didn't devise anything and didn't have any voice or ability to change something or decide what should be done and what should not. I followed my orders and did my job as any reliable and loyal worker would do. I trusted the company I was working for, the boss of the company and my direct manager and my friend – Chief of the Programming Department. (*See* Exhibit A).

Amidst the world-wide financial crisis, Mr. Aleksejev, as his family's sole breadwinner and in order to maintain his employment, assisted his superiors in advancing the charged fraud. Upon pleading guilty, he stated: "Another co-defendant asked me to investigate computer anti-viruses in order to find out which host's server they could use for their updates. I understood this would prevent the computers which have the DNS settings already changed, would not be able to update the anti-virus system. These hosts were used by co-defendants to prevent the updates." (*See* plea minutes of Aleksejev on February 1, 2013).

In so doing, he acknowledged his guilt, and the realization of the gravity of his actions has filled him with shame and regret. He has accepted responsibility. He has been separated from his family in Estonia and been in custody for nearly 21 months, and been held in the United States where he knows absolutely no one.

Rather than sulk or wallow in self-pity, bitterness, or resentment, he has used his time at the MCC to better himself and towards the goal of redeeming the mistakes he made. The Focus Forward Project especially commended Mr. Aleksejev for his dedication and participation (*See* Exhibit B, multiple MCC certificates). As much as his criminal conduct does not define him and the otherwise admirable, exemplary life he has led, nor should it be allowed to define his future.

The guideline figure for loss, of course, pays this no mind. Under that regime, he is treated nearly indistinguishably from a mastermind who executes a scheme and pockets the proceeds of the fraud. Mr. Aleksejev plainly does not merit a similar length of imprisonment,

13

and this case is as good an example as any as to why loss amount "should not drive the sentencing process." *Prosperi*, 686 F.3d at 50. "The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense." *See Gupta*, 904 F. Supp. 2d at 350.

The amount of loss is an especially poor proxy for culpability in light of the particular nature of this scheme. While the conduct at issue, so-called click hijacking and advertising replacement deprived others of advertising revenue and allowed the leaders of the conspiracy (not Mr. Aleksejev) to wrongfully enrich themselves, victims were not defrauded in the archetypical sense, i.e., the offense was not of the same order of magnitude as a brazen scheme in which retirees were bilked out of their life savings by lies, deceit, and false representations. There is ample reason to question whether the loss figure truly reflects the intrinsic wrongfulness of the charged conduct when that same calculation applies indiscriminately to so many different situations, including when the fraud at issue is more invidious, the conduct more serious, and the consequences more harmful. *See Stewart*, 590 F.3d at 154 (Calabresi, J., concurring) (noting that the "culpability of an individual defendant might not be captured accurately by a single variable like financial impact").

Mr. Aleksejev also had little control over, and little reason to suspect the amount generated by the conspiracy. *See Herink*, 2010 U.S. Dist. LEXIS 105549, at *19 (imposing non-guidelines sentence in part because loss amount "was magnified by a combination of factors, many of which were beyond the defendant's control"). The loss or gain (again, which Mr. Aleksejev did not receive) was largely dependent on the number of clicks by end users. Tying his sentence so heavily to the arbitrariness of how many people click on a given link or website,

14

does not accomplish the purposes of sentencing or reflect his culpability.  The wrongfulness or seriousness of his conduct is no more or less wrongful or serious based on the fortuity of the number of clicks by the end users, and certainly not to the extent that the Guidelines make it out to be.[5]  *See Gupta*, 904 F. Supp.2d at 350 (dismissing the guidelines enhancement of 18 levels based wholly on the "unpredictable monetary gains by others").  If the scheme here had not functioned as intended, Mr. Aleksejev's limited role, his gain from the offense, and the inherent wrongfulness of his conduct would be largely consistent with where it is now.  It makes no sense that his punishment should be increased so drastically for the gains of others because the plan actually worked.

Given Mr. Aleksejev's conduct, the nature of the scheme, and especially the 18 level enhancement for loss, the Court should heavily scrutinize the effect of the other two enhancements in the plea agreement - for the number of victims and the employ of sophisticated means.  Together, they effectively doubled Mr. Aleksejev's advisory guideline range from 41-51 months to 97-121 months.  Yet the two enhancements, or more precisely the underlying conduct and characteristics that makes them applicable, are all but accounted for in the loss enhancement, and all but inherent in the charged activity.  *See United States v. Jackson*, 346 F.3d 22, 26 (2d

---

[5] In testimony before the Sentencing Commission cited *supra*, Second Circuit Judge Jon O. Newman criticized the Guidelines principle of "incremental immorality," the idea that "for every discrete aspect of criminal conduct, there must be a discrete measure of extra punishment."  He argued that despite its prior absence in the world of penology, the Guidelines, for whatever reason, are structured around it. He singled out the loss table and drug quantity tables as examples, noting that the two-level distinction between theft amounts of $6,000 and $4,000 makes very little sense.  "As I have said on other occasions, no criminal wakes up in the morning and decides that he is going to steal $4,000 dollars but not $6,000 dollars.  He might make a conscious decision to rob a convenience store rather than a bank, but once inside the convenience store, he opens the till and takes what is there.  The fortuity of whether the till contains $4,000 or $6,000 should not result in added punishment."  Judge Newman later added that the precise gradations of the loss or drug tables result in punishment determined largely by the amount of time the conduct occurred, among many other variables, rather than its intrinsic wrongfulness.  *See Newman Statement*, at 4-7.

Cir. 2003) ("Most fraud schemes that obtain more than one half million dollars involve careful planning, some sophisticated techniques, and are extensive.").  More than other species of fraud, the success of this venture, and its ability to generate large amounts of revenue for the leaders of the conspiracy, depended *precisely* on the use of sophisticated means and a large number of victims.  The wrongfulness of Mr. Aleksejev's conduct in a million-dollar computer access conspiracy is unaffected by the fact of sophisticated means and a high number of persons effected.

It serves no penological purpose to adhere strictly to a Guidelines range that is doubled by these redundancies.  The Second Circuit has noted with some skepticism the effect that substantially overlapping sentencing enhancements under § 2B1.1 have on the resulting Guideline range.  *See United States v. Lauersen*, 362 F.3d 160, 164 (2d Cir. 2004) (authorizing "cumulative effects" departure); *United States v. Abiodun*, 536 F.3d 162, 170-71 (2d Cir. 2008).  Even though these offense characteristics do not rise to the level of double counting, it is still appropriate to address their distortive effect by varying downward from the hyper-inflated guidelines range.  *See Jackson*, 346 F.3d at 26 (applying the cumulative effects departure[6] "[e]ven though the enhancements are sufficiently distinct to avoid the vice of double counting," when they are "little more than different ways of characterizing closely related aspects of [the] fraudulent scheme").

## MR. ALEKSEJEV'S HISTORY AND CHARACTERISTICS WARRANT A NON-GUIDELINE SENTENCE

---

[6] In the plea agreement, Mr. Aleksejev waived his right to move for a formal Guidelines departure, but courts have found that factors supporting a departure can also be used to justify a variance under Section 3553(a). *See United States v. Chase*, 560 F.3d 828, 832 (8th Cir. 2009).

16

Mr. Aleksejev's history and characteristics establish that his criminal conduct was aberrant and atypical behavior that warrants a sentence substantially below the Advisory Guideline Range.  Pursuant to § 3553(a)(1) the Court must consider the history and characteristics of the defendant.  As the court noted in *Gupta*, a finding that the defendant's conduct was aberrant behavior, by itself, could warrant a non-guideline sentence.  Mr. Aleksejev has led an otherwise law-abiding life, overcome challenges, and spent his young life working to provide for his family.  Mr. Aleksejev's motivation in the instant offense was not greed.  He did not personally profit from the conduct of others involved.  He is devoted to his family.

Mr. Aleksejev is 32 years old.  He was born in Tartu, Estonia.  His father, a construction worker, died in a building fire in 1998 at the age of 42.  His mother, now 55, lives in Tartu and is employed in a furniture factory (See PSR ¶65-66).  His brother Rodion also lives in Tartu and is a construction worker.

Mr. Aleksejev's country Estonia was part of the former Soviet Union until 1991 and most Estonians, including his own family, faced hard economic times.  He resided with his brother and parents in a small apartment in Tartu until attending university in the capital city of Tallinn at age 18 (See PSR ¶67).

He married Anzela Murova in 2003 and they now have a 10-year-old daughter named Alina.

Alina was born in 2002 and underwent heart surgery at the age of one, and remains under a doctor's care.  Alina has been having difficulties adjusting to the absence of Mr. Aleksejev (*See* PSR ¶71 and attached extract re: Alina's medical history in Exhibit C).

In 2003, Mr. Aleksejev obtained a bachelor's degree in computer science from Tallinn University (*See* PSR ¶79 and college records in Exhibit C).

17

From 2002-2007 Mr. Aleksejev worked as a computer programmer at CodeWiser in Tartu and had gross monthly earnings the equivalent of less than $2,000.00 U.S. dollars (*See* PSR ¶83 and employee contract in Exhibit C).

Mr. Aleksejev as an employee at Rove Digital and Infradata also worked pursuant to a employee contract and received gross monthly earnings (*See* PSR ¶82 and employee contracts in Exhibit C).

Mr. Aleksejev has no assets in Estonia or elsewhere, and his wife recently sold their car in an effort to obtain needed funds for their family.

As a result of Mr. Aleksejev's lack of any ties with the United States, counsel has secured documents and multiple letters from family, colleagues and friends in Estonia which confirm and add to information provided in the PSR (*See* Exhibit D).  Those documents include:

- elementary school records
- high school ("gymnasium") records
- college records
- marriage certificate
- birth certificate of Alina
- extract re: Alina's medical history
- employee contracts with CodeWiser, Rove Digital, and Infradata.

<u>LETTERS</u>

Unfortunately, when facing a criminal sentencing proceeding, a defendant's criminal conduct undoubtedly overshadows otherwise virtuous characteristics.  Our sentencing memorandum is not an attempt to convince the court that Mr. Aleksejev's actions ought to be excused, although compassion for him ought to be part of the Court's calculus in determining a just sentence.  He appears as a person worthy of a sentence that looks towards redemption rather than severe punishment.

Now that courts have again been given the authority, responsibility and discretion to fashion a sentence individualized for both the circumstances of the offense and the characteristics of the defendant, the importance of adequately presenting to the court the characteristics of the person to be sentenced cannot be understated.  Nevertheless, I have found that this section is the most difficult one to express meaningfully in a sentencing submission. Almost every person that comes before a court for sentencing has a story to tell, a reason why leniency should be granted and a claim of "never again," having learned his or her lesson.  Any competent attorney can present some support for why his or her client is special and deserves leniency.  But to truly reveal the qualities that define the character of the person in a few pages is a daunting and difficult task.

Though the PSR does a good job of setting forth his history and characteristics, Mr. Aleksejev is fortunate to have family and friends who are willing and able to provide a window into his character and personal qualities that I would be unable to duplicate.  Their letters display their love of and belief in Mr. Aleksejev as a father, brother, son, friend and member of the community.

We have received more than 25 letters of support for Mr. Aleksejev.  These letters are included with this submission as Exhibit D.  For the most part, the authors are people who have known Mr. Aleksejev for 10 years or more, and in some cases his entire life.  This in itself speaks volumes; as Mr. Aleksejev, who is somewhat introverted in nature, clearly forms lasting friendships and stands by the people in his life.  The picture of the man who emerges from the pages of the letters is most striking.  Viewed as a whole, the letters are a testament to his love of family and friends.  The letters of support uniformly praise his devotion to family.

For example, his wife Anzela writes,

19

"Valeri has always been actively involved in the life of our child.  He would attend holidays in the kindergarten and in school spent weekends with us.  Alina took her first step in his presence...Even now, being so far away from us, separated by the ocean, he worries about us, always asks how my daughter and I are doing...He is respected by my parents, by my brother and by all my relatives.  Valeri is a man who respects his relatives, loves and respects his mother, his brother and his family and who keeps the memory of his father alive, who unfortunately is not with us anymore."

His daughter Alina, 10 years old, wrote, "I miss my father very much and he misses me too.  He sends me beautiful drawings...I want to see and hug my daddy so much, I hope that he will be home soon."

Valeri's mother Irina Aleksejev writes,

"We never had much money in the family, especially after my husband's and Valeri and Rodion (brother) father's death in 1998.  Valeri assumed the role of the head of the family...He always worked during his school breaks at the plant in order to earn money for studying.  In 2002 he married Anzela, and in the same year they had a daughter Alina.  The girl was born with a heart defect, and Valeri and Anzela took turns in caring for her at night, because the girl was not allowed to cry hard...Valeri is a good and thoughtful father, Alina loves her father and now they miss each other really badly...
Valeri is a caring grandson. When my father, who was 91 years old, got ill in his village...Valeri immediately took him to live with him...but Valeri and his wife cared for him for three years.  The fed him, they bathed him, they completely took care of him."

His only sibling, Rodion Aleksejev, writes,

"My entire childhood was associated mainly with my brother, because our parents often were not home, they worked, Valeri assumed my mentor's role, although he is only two and a half years older than me...Because we were poor, who knows where I would have ended up if it has not been for my brother...He also taught me to be attentive to our parents and to our elderly grandmothers and grandfathers."

His mother-in-law Ekaterina Murova, writes,

"I do not work at the present time.  I am receiving pension due to my disability...He is like a son to me...It happened that I was diagnosed with breast cancer.  I had surgery, then chemotherapy for a half a year (once every three

20

weeks). He took care of me like he was my son. He was driving me to the doctors, taking me to have procedures done, visiting me when I was in the hospital…"

His sister-in-law Lyudmila Aleksejev, reflects:

"I am the wife of Valeri's brother, Rodion Aleksejev…Valeri is the godfather of our son Andrey. We are very happy that we have such an attentive, thoughtful, responsive, always ready to help, good-hearted and responsible godfather. Valerie was taking care of his godson Andrey as if he were his own son…For my husband Valeri is more than just a brother. They are very close and always support each other since there are no closer souls to them then each other in the whole wide world…I was amazed to see how they take care of their mother…they had been supporting her since their youth because their father Viktor passed away too soon."

Valeri's grandmother's sister, 76-years-old writes,

"I suffered from a stroke, then I had a heart attack and due to my health condition I retired when I was fifty years old. When Valeri was a student, he lived with me in my apartment for two years. I never met such a decent and good person like him. He helped me, he went to the store, and he cooked…When he happened to be in Tallinn, he would always come to visit me and bring a present…The relationships in Valerie's family were always very friendly and they always received me very well and took good care of me. They lived frugally because Valerie was the only one who worked and he supported the entire family."

Some of the comments by his friends and colleagues include those of Engeniy Gusarov-

Shlendukhov, who writes:

"I have known Valeri for a long time. We went to the same school since the fifth grade…Valeri is a person who is always ready to help anybody, ready to listen and give either advice or actual help. He is always ready to help, but at the same time he is very shy about asking for help for himself. Sometimes I had the impression that he lives just for people who are close to his heart."

His friend Denis Gusev, who knows him from grade school, gives an example of Mr.

Aleksejev's giving nature:

"I had to pick up my father from the village which was located at the border of our country (a two hour drive from my town and a two-hour drive back). When I was very close to my destination, my car broke down. I was not able to fix it on

the spot.  I was in the middle of nowhere and did not know how to get out of there...

I called Valeri and asked him if he could come and transport me and my car back to our town.  Valeri came over and moved my car and me back to our town, spending his entire day off helping me."

A colleague, Dimitry Bobkov, who has known Mr. Aleksejev for approximately 10 years, comments,

"Valeri has always been a calm, modest and highly motivated person without any arrogance.  One could always rely on him, because working as a team on projects, we often depended on each other....Outside of work, Valeri has not changed.  He was the same modest, pleasant in all respects, person."

A friend of Mr. Aleksejev's mother, Madis Tralla, age 51, reflects:

"I met Valeri in 2000...He accepted me as his older friend.  He was calm, balanced, slightly shy, and a very smart guy...always responsive if someone needs help.  For example, when I decided to renovate my apartment, Valera and Rodion, his younger brother, helped me.  They were putting the wallpaper up, laying down a new floor.  When my TV broke down, he immediately volunteered to see what was wrong."

Commenting on Valeri's family,

"Valeri has a good attitude towards his mother, Irina Aleksejev, and toward the entire family as well...Their relationships are full of kindness, warmth, sympathy, and understanding toward each other.  If someone is having trouble, then everybody rushes to help that person."

To be clear -- none of these letters of praise are offered to excuse Mr. Aleksejev's criminal behavior.  But, when viewed in the context of his role at Rove Digital and his dependence on his employers (for his livelihood), it is respectfully submitted that the conduct of this otherwise shy, kind, decent and hard-working man becomes more comprehensible.

## OTHER FACTORS

Mr. Aleksejev was arrested in his homeland Estonia and imprisoned in extremely harsh conditions for seven months prior to his extradition from the United States.  Some of those harsh

22

conditions included one shower per week, including washing his own clothes during that shower; lockdown twenty-three (23) hours a day; and only one non-contact family visit per month for one hour.

As previously noted, he does not know anyone in the United States, and other than counsel and a representative from the Estonian Embassy on one occasion, has never received a visit while detained at the Metropolitan Correction Center.

As noted in the PSR and family letters, no one in his immediate family has the resources to fly here to visit him and his wife has returned to work and sold their modest car, which is further indication that Mr. Aleksejev did not benefit monetarily from this fraud.

Mr. Aleksejev is now housed at the MCC, which is notoriously overcrowded. The harsh conditions of presentence confinement at the MCC can be appropriate grounds for a shorter sentence. *See, e.g., United States v. Carty,* 264 F.3d 191, 196 (2d Cir. 2001). Indeed, judges in this District have recognized that the overcrowded and unsanitary conditions at the MCC are grounds for leniency sentencing. *United States v. Mendola,* 03-CR-449 (S.D.N.Y. 2005) (Judge Wood reduced a sentence by one-third of the time the inmate had spent in the MCC due to its poor conditions; because "there is overcrowding, that there are unsanitary conditions, inadequate bathroom facilities, inadequate medical attention…under Section 3553, some lowering of what would otherwise be his sentence is appropriate."). As the Court is also aware, Mr. Aleksejev is not eligible for a number of other programs within the Bureau of Prisons, as he is not a citizen of the United States.

As also previously noted, notwithstanding the limited resources and somewhat difficult conditions for a pretrial detainee at the MCC, Mr. Aleksejev did not wallow in his new unknown

environment, but immediately and continuously availed himself of every possible "intellectual endeavor" offered there (*See* Exhibit B).

When taken into custody by United States officials in Estonia, Mr. Aleksejev immediately provided the government with his passwords and cooperated with them as per their request.

In addition, as the Court is aware, at the conclusion of his incarceration in the United States, Mr. Aleksejev can anticipate spending additional time in an immigration facility awaiting deportation.

CONCLUSION

For all of these reasons, a non-guideline sentence under Section 3553(a) is more than justified, and would be consistent with how other courts have approached sentencing under the imperfect, loss-driven Guideline regime. *See e, g., Marsh*, 820 F. Supp. 2d at 351-60 (sentencing employee defendants, including salespersons who contacted investor victims, to terms of 24, 18, 3, and 12 months where Guideline ranges were from 10 to 20 years for fraud losses approaching $20 million); *Herink*, 2010 U.S. Dist. LEXIS, at *20 (varying downward under 3553(a) to 18 months from guideline range of 51-63 months for fraud offender because although loss [$6.8 million] was high, sentencing him as if he "wholly responsible for the total loss would exaggerate his culpability"); *Prosperi*, 686 F.3d at 47-50 & n.11 (affirming 3553(a) variance imposing 6 months home confinement, down from guideline range of 87-108 months, in light of [1] loss amount [$5.2 million] as a poor, unfair proxy for culpability, [2] relative lack of harm, and [3] lack of personal enrichment or benefit from the fraud).

Mr. Aleksejev understands that the Court has an obligation to send a message to the general public in order to deter the public from engaging in similar criminal conduct.  I

24

respectfully submit that the Court should send the message to the public that the defendant will be sentenced in proportion to his level of culpability – that in cases like this the Court will consider loss amount, but also individual profit for which the defendant is responsible, including comprehensive knowledge of the participant, and length of one's involvement in the conspiracy. Certainly the loss amount is relevant; however, it overstates the moral seriousness of his role in the charged conspiracy and the need for deterrence.  It represents the monetary gain of others, and does not adequately reflect the seriousness of his offense.

Mr. Aleksejev respectfully suggests that a substantial variance is warranted and that a sentence no more than necessary to meet the purposes of sentencing would include a period of incarceration far short of the 97 months called for by the advisory Sentencing Guidelines.

Mr. Aleksejev has engaged in much soul-searching since his arrest.  He became involved in this conspiracy as a result of his employment with Rove Digital and initial lack of awareness of the ramifications of his actions.  In the context of his life history, his actions can be characterized as aberrant.

Wherefore, Mr. Aleksejev respectfully requests, based on the nature of the charges, and his individual facts and circumstances, Your Honor impose a sentence that is sufficient, but not greater than necessary to achieve the sentencing goals as set forth in 18 U.S.C. § 3553(a).

Dated:      New York, New York
            July 16, 2013

                                    Respectfully submitted,

                                    William J. Stampur, Esq.
                                    Hurwitz, Stampur & Roth
                                    299 Broadway, Suite 800
                                    New York, New York 10007
                                    212-619-4240
                                    wjstampur@hotmail.com
                                    *Attorney for Valeri Aleksejev*

cc: AUSA Sarah Y. Lai
    Valeri Aleksejev
    USPO Christopher Ferrall

26